## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER CONWAY,                    :       Civil No. 3:24-cv-427

           Plaintiff              :       (Judge Mariani)

      v.                               :

SUPERINTENDENT RIVELLO, *et al.*,      :

           Defendants             :

### MEMORANDUM

Plaintiff Christopher Conway ("Conway"), an inmate housed, at all relevant times, at the State Correctional Institution, Huntingdon, Pennsylvania ("SCI-Huntingdon"), commenced this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is proceeding via an amended complaint. (Doc. 12). The remaining claims are an Eighth Amendment failure to protect claim, and an Eighth Amendment deliberate indifference to vulnerability to suicide claim. Named as Defendants are Superintendent Rivello, Captain Wendle, Correctional Officer Wakefield, Correctional Officer Winnick, Correctional Officer Renninger, and Correctional Officer Stoltzfus[1].

---

[1]    By Memorandum and Order dated January 27, 2025, the Court, *inter alia*, dismissed the retaliation claim against Defendant Stoltzfus and granted Conway leave to amend his retaliation claim against Stoltzfus. (Docs. 32, 33). Conway's proposed amendment was due by February 14, 2025. (Doc. 33 ¶ 2(c)). The Court advised Conway that "[f]ailure to timely file a proposed amendment will convert the dismissal of [this] claim[] without prejudice to a dismissal with prejudice without the necessity of a further Order of Court." (*Id.*). Conway did not file a proposed amendment. Instead, on June 24, 2025, Conway filed a motion for leave to amend to "add...injur[ies]" he sustained during the June 26, 2023 incident. (Doc. 47, at 1). On July 28, 2025, the Court granted Conway's limited request to amend and allowed him the opportunity to file a proposed amendment "only with respect to the alleged injuries he sustained in relation

Presently before the Court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 by Defendants Rivello, Wakefield, Winnick, and Renninger. (Doc. 83). The motion is ripe for resolution. For the reasons set forth below, the Court will grant the motion in part and deny it in part.

In addition, the Court finds that Defendant Wendle is entitled to entry of *sua sponte* judgment in his favor. *See Wilson v. Rackmill*, 878 F.2d 772, 774 (3d Cir. 1989).

## I.   Statement of Undisputed Facts[2]

Conway was incarcerated at SCI-Huntingdon and was transferred to cell G-D-1002 on June 26, 2023. (Doc. 65 ¶ 1; Doc. 77 ¶ 1). Conway initiated this action on or about March 11, 2024, and filed his amended complaint on April 26, 2024. (*Id.* ¶ 2).

Conway claims that Defendants violated his constitutional rights against cruel and unusual punishment by exposing him to inhumane conditions of confinement and acting with deliberate indifference to his particular vulnerability to suicide. (*Id.* ¶ 3). Specifically,

---

to the June 26, 2023 incident." (Doc. 53). In response, Conway filed a proposed amendment re-alleging his claims, in contravention of the July 28, 2025 Court Order. (Doc. 60). The claims contained in this unauthorized proposed amendment, which are largely redundant of the claims in the amended complaint, will not be considered by the Court. Because Conway never timely filed a proposed amendment with respect to his retaliation claim against Defendant Stoltzfus (in accordance with the Court's January 27, 2025 Order), the retaliation claim against Defendant Stoltzfus is dismissed with prejudice, and no further claims remain against Defendant Stoltzfus.

[2]   Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 65, 77).

2

Conway claims that Defendants Wakefield and Renninger escorted him to a "grind-up cell" in which an inmate had recently smeared feces, and that the move was approved by Defendants Rivello and Wendle. (*Id.* ¶ 4). Conway alleges that upon placement in the cell, he asked Defendants Winnick and Renninger to remove him from the cell and made gestures to the cell camera. (*Id.* ¶ 5). He avers that he was forced to eat in the cell and that he informed Defendants Winnick and Renninger that he was suicidal, but they laughed at him and ignored him. (*Id.* ¶¶ 6-7).

Conway states that he subsequently fashioned a noose and hung himself. (*Id.* ¶ 8). He further asserts that as a result, he suffered a heart attack and had to be hospitalized. (*Id.*). Conway avers that he was not supposed to be placed in a cell with feces on the wall for any period, and rather was "supposed to be kept in the strip cage until a biohazard worker trained in cleaning body fluids cleaned said cell." (*Id.* ¶ 9). He also contends that as a result of his placement in the cell, he was "put...in a paranoid schizophrenic mind state, [which] cause[d] [him] to attempt suicide." (*Id.* ¶ 10).

Facts Related to Conway's Conditions of Confinement Claim

**Facts Pertaining to a Substantial Risk of Serious Harm**

Conway claims that he was exposed to feces in his cell. (*Id.* ¶ 11). Defendants contend that Conway's exposure, if any, was extraordinarily limited as he was in his cell for less than one hour before he engaged in self-injurious behavior. (Doc. 65 ¶ 12). Conway admits that though he claims there was feces "on [his] wall and the window," he did not see

or locate any feces for approximately 10 minutes, out of his less than one hour placement in the cell. (Doc. 65 ¶ 13; Doc. 77 ¶ 13).

Defendants contend that Conway admits that the cell was cleaned prior to his placement in it. (Doc. 65 ¶ 14). In response, Conway avers that he never admitted that the cell was cleaned prior to his placement in the cell. (Doc. 77 ¶ 14).

Defendants further contend that a review of the cell's camera shows no readily apparent fecal smears on either the rear window or wall of his cell. (Doc. 65 ¶ 15). In response, Conway avers that the handheld camera shows fecal matter on the window of the cell. (Doc. 77 ¶ 15).

Defendants contend that Conway's claim that the alleged presence of feces caused him harm by "put[ting] him in a paranoid and schizophrenic mind state, and cause[d] [him] to attempt suicide[,]" cannot be proven as his claim of paranoia and schizophrenia is self-diagnosed. (Doc. 65 ¶ 16). Conway does not dispute this fact. (Doc. 77 ¶ 16). Defendants maintain that Conway's mental health records do not reflect any such diagnoses. (Doc. 65 ¶ 17). In response, Conway avers that his mental health records reflect that he is a risk for suicide attempts and has a history of depression and hallucinations. (Doc. 77 ¶ 17).

Defendants also contend that Conway admits that he "told [the] CO [he] was going to hurt [himself] hoping that will remove me from the cell." (Doc. 65 ¶ 18). Conway admits that he "did hope that he would be move[d] [i]nstead of having to take his life to be free from the cell of torture." (Doc. 77 ¶ 18).

4

Conway admits that he was frustrated that his requests to be moved to another cell were allegedly "(repeatedly)…ignored, creating a sense of frustration and helplessness." (Doc. 65 ¶ 19; Doc. 77 ¶ 19).

### Facts Pertaining to Deliberate Indifference to a Substantial Risk to Conway's Health or Safety arising from his Conditions of Confinement

Defendants again contend that Conway admits that his cell had been previously cleaned before he was placed in it. (Doc. 65 ¶ 20). Conway testified that during the brief interval he was placed in the cell, he first spoke with Defendant Winnick asking for food, and did so approximately 10 minutes after being placed in the cell, before he allegedly discovered the fecal matter. (Doc. 65 ¶ 21; Doc. 77 ¶ 21). Defendants assert that Conway further testified that upon Winnick's return with the tray a few minutes later, Conway purportedly told Winnick that he found fecal matter in the cell and could not remain there, though Conway admits he did not recall specifically what he told Winnick, or Winnick's response. (Doc. 65 ¶ 22). In response, Conway asserts that the video shows that when he received the tray from Winnick, Conway can be seen pointing to the window. (Doc. 77 ¶ 22). Conway contends that he does not remember all the details from his interaction with Winnick because the interaction was several years ago and his memory is affected by his prior alcohol and drug use. (*Id.*).

Defendants assert that Conway then testified that Winnick, at some point, returned to the cell a third time, and Conway again told him he needed to be removed from the cell. (Doc. 65 ¶ 23). Conway does not remember this third interaction, but he does "recall

making the threat of suicide when received his tray and report[ed] the condition of the cell." (Doc. 65 ¶ 24; Doc. 77 ¶¶ 23-24).  Defendants assert that, while Conway remembers threatening suicide, he cannot recall during which round he made the threat, nor the intervals between any officer's rounds.  (Doc. 65 ¶ 24).  Winnick likewise recalls talking to Conway, but does not recall the number of times that Conway complained of fecal matter in his cell, requested removal from his cell, nor claimed suicidal intent.  (Doc. 65 ¶ 25; Doc. 77 ¶ 25).

Conway reiterated his claims that after Defendant Renninger returned on a round after placing Conway in his cell, he informed Renninger that he needed to be removed from the cell and was suicidal.  (Doc. 65 ¶ 26; Doc. 77 ¶ 26).  However, Defendants assert that, just as with his testimony regarding Winnick, Conway does not remember Renninger's response but asserts Renninger told him to file a grievance.  (Doc. 65 ¶ 27).  Conway contends that he told Renninger that he was suicidal and informed him of the cell condition, and that Renninger laughed and told him "that['s] what [he] get[s] for filing [a] grievance." (Doc. 77 ¶ 27).  Conway claims that this occurred after Winnick had returned with Conway's food tray and after he had told Winnick he was suicidal.  (Doc. 65 ¶ 28; Doc. 77 ¶ 28). Conway claims that Renninger left and then came back with a misconduct citation, at which point Conway had allegedly tied a noose and begun hanging himself in front of Renninger. (Doc. 65 ¶ 29; Doc. 77 ¶ 29).

Additionally, Defendants contend that the record reflects that after Conway requested to speak with a lieutenant about his cell placement, the lieutenant was contacted, but was not on the block at the time, during which "in less than one hour and prior to the lieutenant's return to the unit, [Conway] attempted self-injurious behavior, which did not allow the lieutenant time to assess the situation prior to [Conway] harming [himself]." (Doc. 65 ¶ 30). In response, Conway asserts that there is no evidence that a lieutenant was contacted. (Doc. 77 ¶ 30).

Defendants also contend that no out of cell movement could occur without the presence of a commissioned officer such as a lieutenant. (Doc. 65 ¶ 31). They thus contend that it would be impossible for Winnick and Renninger to immediately move Conway. (Id. ¶ 32). Conway counters that correctional officers regularly move inmates in and out of their cells, and that he was moved to this cell without the presence of a lieutenant. (Doc. 77 ¶¶ 31-32).

Defendants assert that Conway lacks competent, admissible evidence demonstrating that Defendants had actual knowledge that Conway's conditions of confinement represented "a substantial risk of health or safety" which they recklessly disregarded. (Doc. 65 ¶ 33). Not only did the conditions not amount to "a substantial risk of health or safety" for the reasons discussed above, but Defendants also maintain that Conway has not, and cannot, produce evidence demonstrating that Conway's placement in the cell would "put [him] in a paranoid schizophrenic mind state, and cause [him] to attempt

7

suicide." (*Id.*). Conway counters that Defendant Renninger told him that he was going in a cell with fecal matter, that Conway saw fecal matter in the cell, that the video shows Conway pointing at the back wall and window and reporting that he was suicidal, and that the video also shows Winnick laughing at him and Renninger disregarding the risk to Conway's health and safety, and that Conway then attempted suicide. (Doc. 77 ¶ 33).

Defendants against assert that Conway's allegations are based upon self-diagnosis. (Doc. 65 ¶ 34). Conway does not dispute this statement, but he asserts that his mental health records indicate that he was diagnosed with depression and anxiety and is classified as a chronic suicide risk. (Doc. 77 ¶ 34). Defendants maintain that Conway lacks any evidence demonstrating that Defendants had access to Conway's mental health records, which do not contain a diagnosis of paranoia or schizophrenia. (Doc. 65 ¶ 35). Conway counters that Defendants can contact the medical department at SCI-Huntingdon for information about him. (Doc. 77 ¶ 35).

<u>Facts Related to Conway's Vulnerability to Suicide Claim</u>

**Facts Pertaining to a Particular Vulnerability to Suicide**

Conway alleges that Defendants Winnick and Renninger acted with deliberate indifference to his vulnerability to suicide when they purportedly failed to remove him from his cell and prevent his suicide attempt. (Doc. 65 ¶ 36; Doc. 77 ¶ 36). Conway claims that despite multiple warnings that he was going to kill himself if he was not removed, the officers disregarded his threats and laughed. (*Id.* ¶ 37).

8

Defendants admit that Conway now has a history of suicide attempts in light of this case. (*Id.* ¶ 38). However, Defendants contend that prior to this event, Conway had none as late as January 30, 2023 and denied having self-injurious thoughts or suicidal ideations as late as April 7, 2023. (Doc. 65 ¶ 39). Conway asserts that he is classified as a chronic risk suicide factor. (Doc. 77 ¶ 39).

Defendants maintain that Conway himself admitted that in this case, his "attempted hanging…was not due to suicide attempt but attempt to be moved to a more suitable cell", "this was due to requesting being moved to a cleaner cell and being dismissed by unit officers." (Doc. 65 ¶ 40). Conway counters that his attempted suicide was serious, and his needs were ignored. (Doc. 77 ¶ 40).

### Facts Pertaining to whether Winnick and Renninger knew, or should have known, about Conway's particular vulnerability to suicide

Defendants assert that there is no evidence that they had access to Conway's medical records, and as previously established, his mental health history did not reflect a vulnerability to suicide before this incident. (Doc. 65 ¶ 41). They further assert that there is no evidence of a need to respond until after Conway placed the makeshift noose around his neck. (*Id.* ¶ 42).

Conway counters that the video shows that he reported a serious threat of suicide to Winnick and Renninger, and that Renninger laughed at him and walked away. (Doc. 77 ¶¶ 41-42).

**Facts Pertaining to whether Defendants acted with Deliberate Indifference to Conway's alleged Vulnerability**

Defendants assert that the Extraordinary Occurrence Report resulting from Conway's apparent hanging attempt, and the video, demonstrate that Renninger immediately attended to Conway. (Doc. 65 ¶ 43). Conway again maintains that Renninger ignored the report of his suicide threat. (Doc. 77 ¶ 29).

According to Renninger, he was conducting rounds when he saw that Conway had "fabricated a noose around his neck which was tied to the top bed rail." (Doc. 65 ¶ 44). Conway asserts that this was on Renninger's second round, and Renninger "left [Conway] at risk on his 1st round." (Doc. 77 ¶ 44). Renninger asserts that he immediately radioed the control room and ordered Conway to stop, while Conway again asserts that Renninger radioed the control room on his second round, not on his first round. (Doc. 65 ¶ 45; Doc. 77 ¶ 45).

Defendants assert that, upon other staff members' arrival, the door was opened and Renninger supported Conway by his left arm and leg. (Doc. 65 ¶ 46). Conway counters that there is no video footage of Renninger supporting his arm or leg. (Doc. 77 ¶ 46).

Defendants next contend that Conway was cut down and Renninger lowered him to the ground, put him in the "recovery position", and further worked to restrain him. (Doc. 65 ¶ 47). Conway counters that there is no video footage to support these events. (Doc. 77 ¶ 47).

The parties agree that Renninger then left the cell so that medical staff could provide assistance. (Doc. 65 ¶ 48; Doc. 77 ¶ 48). Defendants assert that this recounting is verified by closed circuit video and handheld footage, which provide a complete picture of the incident. (Doc. 65 ¶ 49). Conway counters that there is no video footage to support these events. (Doc. 77 ¶ 49).

Defendants maintain that the cell video footage begins at approximately 5:45 p.m. on June 26, 2023, and shows Conway facing the rear window to his cell while seated on the cell's desk. (Doc. 65 ¶ 50). Conway asserts that the video is "alter[ed], tampered or destroyed" because he was in the cell before 5:45 p.m. (Doc. 77 ¶ 50).

The parties agree to the following facts. (Doc. 65 ¶¶ 51-64; Doc. 77 ¶¶ 51-64). At approximately 6:17 p.m., Conway is seen on the video tying his jumpsuit to the top bunk in the cell in an apparent attempt to fashion a noose. (*Id.* ¶ 51). Upon finishing, Conway immediately went to his cell door at approximately 6:20 p.m. (*Id.* ¶ 52). During the next 10 minutes, Conway paced repeatedly back and forth in his cell and seemingly checked repeatedly for an officer, flickered the lights in his cell, waved to the camera, and gestured to the noose. (*Id.* ¶ 53). Conway again returned to the front of his cell where he began flickering the lights. (*Id.* ¶ 54). It is not until about 6:34 p.m. that Conway put his head in the noose, where he remained standing and seemingly argued with a correctional officer (who is presumably Renninger). (*Id.* ¶ 55). The video ends at approximately 6:35 p.m. (*Id.*).

The video footage of the hallway of G-Block's D-Quad shows Renninger making rounds. (*Id.* ¶ 56). Upon his return, Renninger stopped at Conway's cell and appeared to speak with Conway for about a minute. (*Id.* ¶ 57). Shortly thereafter, a number of officers responded to the cell. (*Id.* ¶ 58). About 30 seconds later, the officers opened the cell door and entered the cell. (*Id.* ¶ 59). An officer filmed with a handheld camera on the stairs. (*Id.* ¶ 60). After about a minute, the officer with the handheld camera repositioned himself to film near the cell door. (*Id.* ¶ 61). A review of the handheld footage demonstrates that by the time the handheld cameraman began filming, Conway had already been removed from the noose and placed on the floor. (*Id.* ¶ 62). About a minute later, the camera is visibly repositioned to the cell from the stairs. (*Id.* ¶ 63). Medical staff arrived approximately five minutes into the handheld camera footage. (*Id.* ¶ 64). Accordingly, existing footage corroborates that upon seeing Conway with his head in the noose, Renninger intervened, stayed with Conway, and within about two minutes from the time Conway seems to have attempted to hang himself, officers responded and had already lowered Conway from the noose. (*Id.* ¶ 65).

Defendants assert that, in about four to five minutes from the start of the incident, medical staff had been notified and arrived. (Doc. 65 ¶ 66).

## II.    Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality,

12

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non -moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record…or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.    Discussion

Defendants seek summary judgment on the following grounds: (1) Conway cannot establish an Eighth Amendment conditions of confinement claim against Rivello, Wakefield, Winnick, Renninger, and Wendle; (2) Conway cannot establish an Eighth Amendment deliberate indifference to vulnerability to suicide claim against Winnick and Renninger; and (3) Defendants are entitled to qualified immunity. (Doc. 66).

### A.    Eighth Amendment Conditions of Confinement Claim against Rivello, Wakefield, Winnick, Renninger, and Wendle

The Eighth Amendment's prohibition of cruel and unusual punishment imposes constitutional limitations on a prisoner's conditions of confinement. *See Rhodes v.*

*Chapman*, 452 U.S. 337 (1981). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Gilblom v. Gillipsie*, 435 F. App'x 165, 168 (3d Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). First, the plaintiff must demonstrate a deprivation that is "objectively, sufficiently serious." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001) (quoting *Farmer*, 511 U.S. at 834) (quotation marks and citations omitted). The objective component is narrowly defined: only "extreme deprivations" suffice to make out an Eighth Amendment claim. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citing *Rhodes*, 452 U.S. at 347). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). "[A] totality of the circumstances test must be applied to determine whether the conditions of confinement constitute cruel and unusual punishment." *Tillery v. Owens*, 907 F.2d 418, 427 (3d Cir. 1990).

Second, the plaintiff must show that the prison official "subjectively acted with a sufficiently culpable state of mind, i.e., deliberate indifference." *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000). The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298. Thus, "'[t]o overcome a motion for summary judgment, a plaintiff

15

[alleging deliberate indifference] 'must come forward with evidence from which it can be inferred that the defendant-officials were...knowingly and unreasonably disregarding an objectively intolerable risk of harm.'" *Zamichieli v. Pa. Dep't of Corrs.*, 2022 WL 777201, at *3 (3d Cir. Mar. 14, 2022) (quoting *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010)).

Conway claims that the conditions of his cell amounted to cruel and unusual punishment.  He contends that for less than one hour he was subjected to unsanitary conditions because he was exposed to feces in his cell.  Defendants argue that the alleged deprivation was not sufficiently serious to establish a constitutional violation.  (Doc. 66, at 11-18).  The Court agrees.  The condition of Conway's cell does not support a finding that he was deprived of the minimal civilized measure of life's necessities.

Conway fails to point to any evidence in the record from which a jury could infer that the unsanitary conditions of his cell subjected him to a substantial risk of serious harm. Indeed, the Third Circuit has held that, in certain situations, exposure to urine or feces does not constitute a substantial risk of serious harm.  *See Gilblom*, 435 F. App'x at 169 (denying conditions of confinement claim when inmate spent approximately 36 hours in dry cell with his own excrement).  Although "likely unpleasant and... unsanitary," such conditions do not rise to the level of an Eighth Amendment violation.  *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020).  Moreover, the duration of the conditions "cannot be ignored in deciding whether such confinement meets constitutional standards."  *Young v. Quinlan*, 960 F.2d 351, 364

16

(3d Cir. 1992*), superseded by statute on other grounds as stated in Nyhius v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000). Conway does not dispute that he was subjected to this condition for a relatively brief time—Conway admits that he did not see or locate any feces for approximately 10 minutes, out of his less than one hour placement in the cell. (Doc. 65 ¶ 13; Doc. 77 ¶ 13). Exposure to unsanitary cell conditions for far longer durations of time have been found not to present a substantial risk of serious harm. *See, e.g., Gilblom*, 435 F. App'x at 169; *Edge v. Mahlman*, 2021 WL 3725988, at *3 (S.D. Ohio Aug. 23, 2021), *report and recommendation adopted*, 2022 WL 20113138 (S.D. Ohio Mar. 18, 2022) ("It is well-established that the presence of some unsanitary conditions in a cell (including fecal matter) does not establish an Eighth Amendment claim, except in circumstances where the volume of matter and duration of exposure are extreme."); *Barney v. Pulsipher*, 143 F.3d 1299, 1311-12 (10th Cir. 1998) (noting that an 11-day stay in unsanitary cell did not constitute Eighth Amendment violation because the duration was relatively brief).

Additionally, Conway has not presented any evidence from which a reasonable jury could infer that he suffered any harm because of the feces in his cell. *See, e.g., Wilson v. Ellett*, 2016 WL 613824, at *3 (M.D. Pa. Feb. 16, 2016) (quoting *Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill. 1996)) ("[W]hile the Eighth Amendment does not require plaintiff to become deathly ill before a constitutional violation will be found, 'the absence of any ailment other than colds or sore throats militates against characterizing the conditions in [plaintiff's] cell as objectively serious.'"). *See also Lindsey v. Shaffer*, 411 F. App'x 466, 468 (3d Cir.

17

2011) (*per curiam*) (concluding that whether plaintiff suffered harm was critical to determination whether unsanitary conditions were unconstitutional); *Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) (*per curiam*) (concluding that denial for showers for 15 days did not violate the Eighth Amendment when inmate did not "suffer[ ] any harm as a result of the denial of additional showers").

In sum, Conway does not assert, nor does he present any evidence that he was exposed to feces in his cell for an inordinate period of time. Conway's claim that he was placed in a cell with feces for less than one hour fails as a matter of law. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 687 (1978) (noting that unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks and months"); *Gilblom*, 435 F. App'x at 169; *Davis v. Scott,* 157 F.3d 1003, 1004 (5th Cir. 1998) (finding that three-day placement in cell with blood on walls and excrement on floors did not meet Eighth Amendment's objective component); *Dumas v. Pennsylvania Dep't of Corr.*, 2007 WL 1276908 (W.D. Pa. Apr. 30, 2007) (concluding that there was no constitutional violation where the plaintiff alleges he was in filthy conditions for only three weeks). Accordingly, the Court finds that the condition of Conway's cell does not satisfy the objective component of an Eighth Amendment conditions of confinement claim. Defendants Rivello, Wakefield, Winnick, Renninger, and Wendle are entitled to judgment in their favor on the conditions of confinement claim.

18

  B.  <u>Eighth Amendment Vulnerability to Suicide Claim against Winnick and Renninger</u>

Conway asserts that Defendants Winnick and Renninger acted with deliberate indifference to his vulnerability to suicide by failing to remove him from his cell and prevent his suicide attempt.

The Eighth Amendment to the United States Constitution "prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "[An inmate's] particular vulnerability to suicide qualifies as a serious medical need." *Colburn v. Upper Darby Township (Colburn II)*, 946 F.2d 1017, 1023 (3d. Cir. 1991). When a plaintiff seeks to hold prison officials or medical staff accountable for failing to prevent an inmate's suicide, the "vulnerability to suicide framework" applies. *Palakovic* 854 F.3d at 224. To plead a claim under this framework, a plaintiff must show that: (1) the inmate had a particular vulnerability to suicide; (2) the prison official knew or should have known of the inmate's particular vulnerability; and (3) the prison official acted with reckless or deliberate indifference to the inmate's particular vulnerability. *See id.* at 223-24.

  1.  **Particular Vulnerability to Suicide**

An inmate is particularly vulnerable to suicide when there is a "strong likelihood, rather than a mere possibility," that he will harm himself. *Palakovic*, 854 F.3d at 222 (internal quotation marks omitted). An inmate's "strong likelihood" of suicide must be "so obvious" that "a lay person would easily recognize the necessity for preventative action." *Id.*

(internal quotation marks omitted). An inmate's particular vulnerability to suicide must be evaluated on the "totality of the facts presented." *Id.* at 230.

Defendants admit that Conway *now* has a history of suicide attempts. (Doc. 65 ¶ 38). However, they maintain that prior to the event on June 26, 2023, he had no suicide attempts as late as January 30, 2023, and denied having self-injurious thoughts or suicidal ideations as late as April 7, 2023. (*Id.* ¶ 39). Moreover, Defendants assert that Conway himself admitted that in this case, his "attempted hanging…was not due to suicide attempt but attempt to be moved to a more suitable cell," "this was due to requesting to be moved to a cleaner cell and being dismissed by unit officers." (*Id.* ¶ 40). However, the record reflects that Conway has a history of suicide attempts while incarcerated and has a history of depression and anxiety. The records reflect the following.

On January 27, 2023, upon admission to the RHU at SCI-Huntingdon, a Health Care Screening was conducted. (Doc. 77-3). Therein, it was noted that Conway has a history of suicidal behavior and may be a suicide risk. (*Id.* at 1, 3).

On January 27, 2023, a Suicide Rick Indicators Checklist was completed. (Doc. 65-4, at 94). The officer that completed the form noted that he did not have information that Conway may be a suicide risk and that Conway did not show signs of depression, but the officer also noted that Conway "refused to answer questions for risk assessment." (*Id.*).

20

On January 30, 2023, during a Mental Health Care Screening in the RHU, Conway reported suicidal ideations, self-injurious behavior, and refused psychotropic or life sustaining medications. (*Id.* at 77).

On February 16, 2023, during a psychology assessment, Conway verbally denied self-injurious behavior, suicidal ideation, and homicidal ideation. (*Id.* at 71).

On March 10, 2023, at a psychology contact, Conway verbally denied suicidal ideation, homicidal ideation, and auditory/visual hallucinations. (*Id.* at 68).

On April 7, 2023, during a psychology assessment, Conway reported that he "[had] been feeling well over all and ha[d] no mental health concerns." (Doc. 65-4, at 65). He "verbally denie[d] history of [suicide attempt] and verbally denie[d] current [suicidal ideation/homicidal ideation/auditory/visual hallucinations]." (*Id.*). This April 7, 2023 psychology contact was the last visit before Conway's suicide attempt on June 26, 2023.

On June 29, 2023, an individual recovery plan was created following Conway's June 26, 2023 suicide attempt. (*Id.* at 30-33). The June 26, 2023 incident was described as follows:

> Mr. Conway attempted hanging when angry and frustrated when he believed his needs/concerns were being ignored. He reported that he was placed in a cell with feces on the wall and when he repeatedly requested another cell or to have his cell cleaned, he was ignored. Mr. Conway became very emotional as he described his feeling of disrespect and helplessness, leading to a desperate attempt to harm himself. Today, he was emotional but very respectful and receptive to staff efforts to provide support.

21

(*Id.* at 30). Conway was provided support, and it was noted that he would be seen daily in the Psychiatric Observation Cell. (*Id.* at 32).

On July 25, 2023, a brief chart review for psychology was created, and documented Conway's June 26, 2023 suicide attempt. (*Id.* at 13-20). It was noted that Conway has a history of suicide attempts while incarcerated, a history of mental health treatment starting at age 13, he was not on suicide precautions, he was not on the mental health case load, his last psychology contact was on April 7, 2023, his last psychiatry contact was on December 5, 2019, and he was on the inactive B mental health roster (inmates on the B mental health roster have a history of receiving psychiatric treatment, but have no current need for psychiatric care). (*Id.* at 15, 18-19). A summary of the June 26, 2023 suicide attempt is as follows:

> Mr. Conway was placed in the RHU on 6/26/2023 after hours. He expressed frustration and helplessness related to the conditions of his cell and reported asking to have a cell change to which he felt was ignored. Ultimately, he attempted hanging out of extreme frustration and anger. Discharge summary showed edema of the neck. Mr. Conway was ultimately admitted to the ER for observation due to cardiac reasons.

(*Id.* at 20).

While the records reflect Conway's suicidal thoughts fluctuated, there is sufficient evidence for a reasonable jury to conclude that Conway was, in fact, particularly vulnerable to suicide. Notably, the January 27, 2023 Restrictive Housing and Special Management Housing-Health Care Screening indicated that Conway has a history of suicidal behavior and may be a suicide risk. (Doc. 77-3).

22

The Court must next consider whether Defendants Winnick and Renninger knew of Conway's vulnerability and were deliberately indifferent toward it.

### 2. Knew or Should have Known of Particular Vulnerability to Suicide

Prison officials have been found to "know" of an inmate's particular vulnerability to suicide where "they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Palakovic*, 854 F.3d at 230 (citing *Colburn II*, at 1025 n.1.). However, as indicated "by the latter portion of [the] phrase [knew or should have known]," "it is not necessary that [a] custodian have a subjective appreciation of the detainee's 'particular vulnerability.'" *Colburn II*, 946 F.2d at 1024-25. In *Palakovic*, the Third Circuit found that the plaintiffs had pleaded facts plausibly supporting a reasonable inference that prison officials and medical personnel "knew or should have known" of the decedent's particular vulnerability to suicide because the decedent's records "which the corrections officers and medical staff must have—or, at the very least, should have—reviewed when considering both his treatment and whether or not to repeatedly place him in solitary confinement," contained information about prior suicide attempts, a designation as a "suicide behavior risk" with a "Stability Rating D," multiple serious mental illness diagnoses, and placement on a mental health roster. *Palakovic*, 854 F.3d at 230-31.

The Court finds that there is sufficient evidence for a reasonable jury to conclude that Defendants Winnick and Renninger knew or should have known of Conway's particular

vulnerability to suicide. *See Diorio v. Harry*, No. 21-1416, 2022 WL 3025479, at \*5 (3d Cir. Aug. 1, 2022) ("Although our case law does not require actual knowledge,...there must still be enough in the record to establish that defendants knew or should have known that the harm would come about.").

The Court recognizes that there is no evidence that Defendants Winnick or Renninger observed prior suicide attempts by Conway or had access to Conway's mental health records. There is also no evidence in the record that Conway engaged in any prior suicide attempts while in the RHU at SCI-Huntingdon. However, the question in this case is whether Defendants Winnick and Renninger knew or should have known of Conway's particular vulnerability to suicide based on the immediate events prior to the suicide attempt on June 26, 2023.

Conway testified that he threatened suicide to both Defendants Winnick and Renninger on June 26, 2023. (Doc. 65 ¶¶ 24, 26, 28; Doc. 77 ¶¶ 24, 26-28). Conway contends that the video shows that although he reported a serious threat of suicide to Winnick and Renninger, they ignored him and Renninger laughed at him and walked away. (Doc. 77 ¶¶ 41-42). At this point, Conway fashioned a noose and attempted to hang himself. (Doc. 77 ¶ 29). The evidence shows that Conway had personal interactions with Winnick and Renninger immediately prior to his suicide attempt and told them that he was suicidal, which was sufficient to put them on notice of Conway's present suicidality. The

24

evidence is sufficient to support a reasonable conclusion that Defendants Winnick and

Renninger knew or should have known about Conway's particular vulnerability to suicide.

### 3.    Reckless or Deliberate Indifference to Particular Vulnerability to Suicide

Reckless or deliberate indifference to an inmate's particular vulnerability to suicide

requires a showing of "something beyond mere negligence" on the part of the prison

officials. *See Palakovic*, 854 F.3d at 222 (citing *Colburn II*, 946 F.2d at 1024-25). Although

"each case will present unique circumstances and should be considered on its own facts,"

the Third Circuit has held that the following factual scenarios "provide helpful guidance in

determining whether a prison official has acted with deliberate indifference to an inmate's

particular vulnerability to suicide":

> where: (1) a defendant took affirmative action directly leading to the suicide;
> (2) a defendant actually knew of the suicidal tendencies of a particular
> prisoner and ignored the responsibility to take reasonable precautions; or (3)
> a defendant failed to take "necessary and available precautions to protect the
> prisoner from self-inflicted wounds."

*Id.* at 231.

There is sufficient evidence for a reasonable jury to conclude that Defendants

Winnick and Renninger acted recklessly or deliberately indifferent towards Conway's

serious medical need.  The video of the incident, sans audio, shows that at 5:54 p.m.,

Conway tied his t-shirt around his face, and then at 5:57 p.m., began waving to the cell

camera and continued to intermittently wave to the camera until 6:17 p.m., when he tied his

jumpsuit to the top bunk to fashion a noose. (*See* Doc. 65-3, Video Exhibit, Camera

25

Footage of Conway's Cell, June 26, 2023).  Conway then paced back and forth in his cell, flickered the lights in his cell at 6:23 p.m., waved to the camera, and gestured to the noose. (*Id.*; Doc. 65 ¶¶ 51-54; Doc. 77 ¶¶ 51-54).  At approximately 6:34 p.m., the video shows that Conway put his head in the noose, stood there, and argued with a correctional officer (presumed to be Defendant Renninger).  (Doc. 65 ¶ 55; Doc. 77 ¶ 55).  Whether Defendants Winnick and Renninger acted recklessly or deliberately indifferent by waiting until after Conway placed his head in the noose to take action, despite Conway's threats of suicide, is a question for the jury.  Further, the parties dispute whether Conway actually spoke with Defendants Winnick and Renninger, they dispute what was said, and they dispute whether Winnick and Renninger laughed at Conway's threats.  Such a dispute remains because the cell video only shows in the inside of Conway's cell, it does not show who is on the outside of the cell, and it does not contain audio.

In addition, while Defendants Winnick and Renninger maintain that no out of cell movement could occur without the presence of a commissioned officer such as a lieutenant, and they thus could not immediately move Conway (Doc. 65 ¶¶ 31-32), Conway refutes this fact and maintains that correctional officers regularly move inmates in and out of their cells without a lieutenant (Doc. 77 ¶¶ 31-32).  There is a genuine dispute about this fact.

The Court finds that summary judgment is inappropriate because a reasonable jury could find in favor of Conway on this claim.

26

C.    Qualified Immunity

The doctrine of qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. *Pearson v. Callahan*, 555 U.S. 223, 244-45 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231. "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Pearson*, 555 U.S. at 244). The burden to establish qualified immunity rests with the defendant claiming its protection. *Beers-Capitol*, 256 F.3d at 142 n.15.

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first).

Defendants argue that they are entitled to qualified immunity with respect to the conditions of confinement claim and vulnerability to suicide claim. (Doc. 66, at 24-31). The Court finds that Defendants Rivello, Wakefield, Winnick, Renninger, and Wendle are entitled

27

to qualified immunity on the conditions of confinement claim, but Defendants Winnick and Renninger are not entitled to qualified immunity on the vulnerability to suicide claim.

### 1.    Conditions of Confinement Claim

As established above, Conway has not presented sufficient evidence to show a violation of his Eighth Amendment rights with respect to the conditions of his confinement. Accordingly, Defendants Rivello, Wakefield, Winnick, Renninger, and Wendle are entitled to qualified immunity on this claim under the first prong of the analysis.

### 2.    Vulnerability to Suicide Claim

The doctrine of qualified immunity is inapplicable to this claim because Conway had a clearly established constitutional right to protection from his alleged vulnerability to suicide, and a reasonable jury could find that the conduct of Defendants Winnick and Renninger violated that constitutional right to such protection. Starting with the analysis of whether the right is clearly established, it is important to determine if "existing precedent [has] placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Here, Supreme Court and Third Circuit precedent clearly establishes the right against deliberate indifference to inmates' vulnerability to suicide. The Supreme Court has determined that prisons are obligated to take reasonable safety precautions. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). These safety precautions include suicide prevention processes. *Id.* Inmates have an Eighth Amendment right to be protected from acts or

28

omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Estelle*, 429 U.S. at 105.

The Third Circuit has specified that deliberate indifference to an inmate's risk of suicidality constitutes such a violation of constitutional rights to bring forth a Section 1983 claim. *Colburn v. Upper Darby Township*, 838 F.2d 663, 668-69 (3d Cir. 1988) ("*Colburn I*").[3] In *Colburn I*, the Third Circuit held that when a prison official does "know or should know of the particular vulnerability to suicide of an inmate," they have an obligation "not to act with reckless indifference to that vulnerability." *Id.* at 669; *see also Palakovic*, 854 F.3d at 222 (reaffirming that prisons have a Fourteenth Amendment obligation to protect inmates from vulnerability to suicide, which also applies to pre-trial detainees). Here, the constitutional right at issue is Conway's right to protection from his vulnerability to suicide. If the jury were to find there was a strong likelihood that Conway would attempt suicide, Conway had an Eighth Amendment right to protection against that vulnerability, and reckless or deliberate indifference towards that vulnerability would constitute a constitutional violation. Thus, the constitutional right in question is clearly established.

After determining that the constitutional right is clearly established, the question becomes whether Conway established that the conduct of Defendants Winnick and Renninger amounted to a violation of that right. As set forth above, a reasonable jury could

---

[3]    *Colburn I* is a Fourteenth Amendment due process case rather than an Eighth Amendment case. But, the Third Circuit generally treats the standards applied to prison suicides under the Fourteenth and Eighth Amendments as equivalent. *See Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017).

find that Winnick and Renninger's failure to move Conway from the cell after he threatened suicide constituted a violation of Conway's clearly established right to protection against vulnerability to suicide. *See Owens v. City of Philadelphia*, 6 F. Supp. 2d 373, 384 (E.D. Pa. 1998) (to overcome the specific conduct prong of a qualified immunity defense in prison suicide cases, the plaintiff's facts are sufficient if they are "clearly alleged, and provided evidence of, a constitutional deprivation sufficient to meet their burden").

Taking the facts in the light most favorable to Conway, a reasonable jury could find that: (1) he had a particular vulnerability to suicide; (2) Defendants Winnick and Renninger knew or should have known that Conway's direct suicide threat indicated a strong likelihood of suicide; and (3) Winnick and Renninger's choice to not take immediate action to move Conway out of the cell amounted to reckless or deliberate indifference. Thus, a reasonable jury could find that the conduct of Defendants Winnick and Renninger violated Conway's clearly established Eighth Amendment right to protection from vulnerability to suicide, so qualified immunity does not apply to this claim.

30

## IV.    Conclusion

Consistent with the foregoing, Defendants' Rule 56 motion will be granted in part and denied in part.  (Doc. 83).

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: July 20, 2026